UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Peter Nicholaus, Sr.,                     )
                    Plaintiff,            )
                                          )
        v.                                )       C.A. No.   08-101 S
                                          )
International Longshoremen's              )
Association Local 1329,                   )
                    Defendant.            )
                                          )

## DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

In this case, the Plaintiff, Peter Nicholaus, Sr., alleges that the International Longshoremen's Association Local 1329 ("Defendant" or "the Union") improperly disciplined him in violation of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(5), when it decided to no longer consider him a member of its organization.

On July 14, 2009, this Court conducted a one-day bench trial. After considering the exhibits, witness testimony, and the parties' oral and written legal arguments, the Court finds that the Union's decision to consider Plaintiff as officially retired and to no longer recognize his seniority did not constitute an act of discipline and thus did not violate the LMRDA. For the reasons set forth below, judgment shall enter against the Plaintiff, and for the Defendant.

I.    Findings of Fact

This case is best described as an internecine union squabble gone awry.  Plaintiff contends that in March 2007 he was improperly and illegally forced out of his Union after more than forty years of service as a longshoreman.  The Union disagrees and maintains that Plaintiff, per his own request, officially retired on January 1, 2004 and that the Union was rectifying its mistake in failing to recognize his retired status when it terminated Plaintiff's membership.

The Defendant Union is a hiring hall that employs longshoremen to load and off-load cargo at various Rhode Island ports.  If a member of the Union desires work, he reports to the hall and bids on available jobs.  The Union President then assigns jobs to members based on seniority and qualifications.  A member's seniority is reflected on a lettered membership card -- a "D" cardholder for example, is senior to an "L" cardholder.  Thus, if the Union only has three jobs available and four cardholders show up to work, the three most senior cardholders will be called to work.  After forty years with the Union, Plaintiff held an "F" card, which meant he was virtually guaranteed work whenever he wanted it.

The Union maintains a defined contribution retirement plan for its members.  The Rhode Island Shipping Association - International Longshoremen's Association Annuity Fund (hereinafter "Annuity Fund") was started on October 1, 1997 and replaced the Union's defined benefit plan (or pension plan). [1]  The Annuity Fund is an entity separate from the Union and accepts contributions from participating employers in accordance with the terms of its Trust Agreement.  The fund is managed by its own Board of Trustees comprised of both Union and employer representatives.

When the Annuity Fund was created, the Union established an investment account for each member at Fidelity Investments.  The accounts received contributions earned by the members and made by the various employers under the new plan.  As of September 30, 2003, the Plaintiff had accumulated $23,139.37 in his Annuity Fund account.

On November 18, 2003, Plaintiff met with Daniel Campbell, one of the Trustees of the Annuity Fund, to discuss withdrawing money from his account.  Mr. Campbell explained to the Plaintiff (and the governing documents of the Annuity Fund make this point crystal

---

[1] When the old pension fund was terminated, members received a payout based on their years of service.  While the precise amount was not established, it is clear the Plaintiff received a payout in the vicinity of $500,000.

clear as well) that the only way a Union member could withdraw money from the Annuity Fund is if he or she dies, retires, or becomes disabled.

Plaintiff completed the necessary Request For Termination Benefits Form, had Mr. Campbell notarize it, brought the form to his wife so she could complete the spouse's section, and later submitted it to the Annuity Fund to be processed. A received stamp on the front form indicates that it was submitted on November 25, 2003 -- approximately one week after Plaintiff's meeting with Mr. Campbell. On or about January 16, 2004, Plaintiff received a check for his money from the Annuity Fund and deposited it into his personal bank account.

The Request For Termination Benefits Form that Plaintiff completed to make the withdrawal clearly indicates that he was requesting his termination benefits because he was " _retiring_ effective Jan. 1, 2004" and he affirmatively certified that "the information on this form is complete and true." (J. Ex. 6 (emphasis added).) During his testimony, Plaintiff offered an unconvincing explanation as to why the form did not evidence his actual intention to retire (and thus give up his seniority in the Union). Plaintiff stated that he did not read the form before he signed it and that he did not intend to retire from the Union at

4

that time.  He further testified that he was not paying attention
when Mr. Campbell was explaining the form because he was so fixated
on withdrawing his money.  He claimed that he just signed as
directed and figured someone would have told him if he was making
a bad decision.

   The Plaintiff's explanation is not credible, and must be
rejected.  Mr. Campbell testified that he explained to the
Plaintiff the three different circumstances under which the money
could be withdrawn and that in response Plaintiff indicated he did
not know what he was going to do -- the logical inference being
that Plaintiff was not sure if he was ready to retire.  The only
logical explanation is that Plaintiff used the week in between the
time he completed the form and the time he submitted it to reflect
and deliberate on the retirement question.  While it is possible
that Plaintiff may not have fully understood or appreciated all the
ramifications of his decision to retire, it is clear he knew what
he was doing and had an intent to retire when he sought to withdraw
his money from the Annuity Fund.

   Despite indicating that he was retiring on January 1, 2004 and
receiving his lump-sum annuity payout, Plaintiff nevertheless
continued to work as if nothing had changed.  From January 2004
through March 2007, Plaintiff retained his "F" card, which entitled

him to choose his jobs often displacing members junior to him. [2]
The reason Plaintiff was allowed to continue working as a union
member was because the Annuity Fund (contrary to the usual
practice) did not communicate to the Union the fact that Plaintiff
elected to retire.[3]

In September 2004, new Union leadership took office. The new
President investigated the Plaintiff's status, but was told by his
predecessor that the Plaintiff did not retire and had only applied
for Social Security. It was not until late 2006 that the new
President learned that the Plaintiff had in fact requested and
received his money from the Annuity Fund. In February 2007, the
Annuity Fund Trustees finally communicated to the Union that the

---

[2] Union officials testified that the Union's practice has
always been to treat retirees as non-union members, who could only
be hired as "dollar-a-day" men. The Union organization is based on
attrition. As senior members retire junior members move up and
gain seniority.

[3] Several witnesses alluded to "rumors" as to why Plaintiff
was allowed to retain his seniority and continue working. These
witnesses theorized that because Plaintiff was good friends with
the Union President at the time, he worked out a "sweetheart" deal
for himself whereby the President concealed from the membership the
fact Plaintiff had retired. None of the witnesses, however,
offered evidence to support this theory and the Court sees no
reason to indulge such speculation. Whatever the reason for the
failed communication, it is irrelevant to the outcome of this case.
The best that can be said as to why the Annuity Fund did not
communicate Plaintiff's intent to retire to the Union is that it
was a mistake.

Plaintiff had retired.  In March 2007, the Union held an Executive Board meeting to discuss the Plaintiff's status.  Plaintiff was not present at the meeting nor invited to attend.  During this meeting, the Board determined that when Plaintiff signed the form indicating he was retiring effective January 1, 2004 and withdrew his money from the Annuity Fund, he left the Union as of his selected retirement date and was thereafter not entitled to have his seniority recognized.  The Board communicated its decision to the Plaintiff in a letter dated March 19, 2007.  The letter informed him that he had retired, would no longer be considered a union member, and that if he desired to continue working he would be hired as an extra on an as-needed basis.[4]  The letter also stated that if Plaintiff disagreed with the Board's decision, he could appeal in accordance with the Union's Constitution.

Contrary to Plaintiff's claim, the Board's decision was not an attempt to discipline the Plaintiff.  Rather, the Board's action was an attempt to correct the mistake that occurred in 2004 when

_____

[4] Before Plaintiff received this letter, a general announcement notice was prepared by the Board's Treasurer to inform the Union membership that the Union considered Plaintiff to be retired.  This notice was distributed by hand at the Union hall on the morning of March 17, 2007 and it is how Plaintiff first learned of the Board's decision.

the Annuity Fund Trustees failed to notify the Union that the Plaintiff had expressed his intent to retire.

Plaintiff attempted to appeal the Union's decision; however, on September 20, 2007, the Union informed him that it was not willing to further consider his appeal and considered the matter closed.  After the Union changed his status, and began treating him as a non-union "dollar-a-day" laborer, Plaintiff experienced a significant reduction in hours and failed to remain eligible for health insurance, vacation pay, or annuity contributions.

II.  Conclusions of Law

Plaintiff filed this action on March 17, 2008, alleging that the Union impermissibly took adverse action against him without proper notice and without affording him his due process rights under the LMRDA.[5]  The LMRDA grants members of labor organizations certain rights.  See 29 U.S.C. § 401 et. seq.  In pertinent part, the "Bill of Rights" to this Act states:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

_____

[5] Plaintiff's Complaint also alleged two state law causes of action, however, those claims were dismissed prior to trial.

29 U.S.C. § 411(a)(5).

The term "'member' or 'member in good standing', when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization." 29 U.S.C. § 402(o).

The crux of the Plaintiff's argument is that after he filled out the termination benefits form and evidenced his intent to retire, the Union continued to treat him as a member. He claims that when the Union abruptly stopped recognizing his membership, this constituted discipline and expulsion without complying with the LMRDA. In order to prevail on this particular cause of action, Plaintiff must prove that the Union's action constituted discipline. <u>Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6</u>, 493 U.S. 67, 90-91 (1989); <u>see also</u> <u>Finnegan v. Leu</u>, 456 U.S. 431, 438-39 n.9 (1982). Plaintiff has not even come close to meeting this burden.

"Discipline is the criminal law of union government." <u>Breininger</u>, 493 U.S. at 91 (quoting Summers, The Law of Union Discipline, 70 Yale L.J. 175, 178 (1960)). As used in the LMRDA,

"discipline" means the imposition of punishment. <u>See</u> <u>id.</u> at 92 n.15, 93 (stating that discipline, as envisioned by Congress, is imposed as a sentence in order to punish a violation of union rules); <u>Bullock v. Dressel</u>, 435 F.3d 294, 298 (3d Cir. 2006) (stating the purpose of discipline must be to enforce union rules or to punish a violation of union rules, as opposed to engaging in ad hoc retaliation motivated by personal vendettas); <u>Linnane v. Gen. Elec. Co.</u>, 948 F.2d 69, 71 (1st Cir. 1991) (stating discipline denotes only punishment).

The Executive Board's decision to no longer recognize Plaintiff's membership was a direct result of the Plaintiff's expression of his intent to retire and was not meant to punish or penalize him for a violation of Union rules. Because the Union did not discipline the Plaintiff, the LMRDA is not triggered, and judgment must enter for the Defendant.

The Court's conclusion on the merits of this case should not be taken as an indication that the Union behaved appropriately in its treatment of the Plaintiff. For example, if the Plaintiff sincerely believed he had retired by mistake, the Union could have simply allowed the Plaintiff to pay back the money he withdrew (with interest) and continue on as a member. The Union's behavior

calls into question whether the Union complied with its duty to fairly represent the Plaintiff.

The duty of fair representation requires a union to represent its members "honestly and in good faith and without invidious discrimination or arbitrary conduct." Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570 (1976). The duty is breached when a union's treatment of a member is "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967). In the hiring hall context, the duty of fair representation is a heightened one. See Breininger, 493 U.S. at 89; Jacoby v. N.L.R.B., 325 F.3d 301, 309 (D.C. Cir. 2003). The duty is heightened because the imbalance of power and possibilities for abuse inherent in the operation of a hiring hall necessitates a greater need for the union to exercise its power responsibly and fairly. Jacoby v. N.L.R.B., 233 F.3d 611, 616 (D.C. Cir. 2000) (citing Breininger, 493 U.S. at 89); see also Lucas v. N.L.R.B., 333 F.3d 927, 934-35 (9th Cir. 2003). Such a claim can be brought by an aggrieved member solely against the union. Breininger, 493 U.S. at 82-83.

Here, Plaintiff did not elect to pursue a fair representation claim and whether he would have succeeded under such a theory will never be known. See Sams v. United Food & Commercial Workers Int'l

Union, AFL-CIO, CLC, 866 F.2d 1380, 1385 (11th Cir. 1989) (stating that where a plaintiff has not plead the duty of fair representation he or she cannot prevail on it). And by now, such an action would almost certainly be time barred. See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 172 (1983) (adopting from § 10(b) of the NLRA a six-month statute of limitations for so-called hybrid actions that involve claims against a union and an employer for breach of the duty of fair representation and a breach of a collective bargaining agreement). But see The Developing Labor Law, ch. 25.IV p. 2068 (John E. Higgins, Jr., ed.-in-chief, 5th ed. 2006) (collecting cases and stating that a number of courts have determined the six-month statute of limitations does not apply in non-hybrid cases and instead apply the analogous state statute, however, some jurisdictions do apply the six-month limitations period to non-hybrid cases).

For the foregoing reasons, Plaintiff failed to meet his burden under the LMRDA, so it is hereby ordered that judgment shall enter in favor of Defendant.

IT IS SO ORDERED

William E. Smith
United States District Judge
Date: 8/11/09

12